# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

Cory Fairfield

v. Case No. 23-cv-873-JPS

Waukesha County, et al.

---

# PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO PERMIT THE TESTIMONY OF EXPERT WITNESS DR. ROSS MACDONALD

---

**Contents**


Brief Summary of the Facts upon which Fairfield's Claims are Based ............ 2

Argument ............ 4

I. The Court is the Gatekeeper to Ensure that only Helpful and Reliable Expert Testimony Reaches the Jury. ............ 4

II. The Expert Testimony and Opinions of Dr. Ross MacDonald Satisfy the Requirements of Rule 702 and *Daubert*. ............ 7

A. Dr. MacDonald's Credentials and Expertise ............ 8

B. Dr. MacDonald's Opinions About Opioid Use Disorder and the Treatment of that Condition ............ 9

C. Dr. MacDonald's Opinions about Cory Fairfield's Condition and his Need for Treatment while in Jail ............ 11

D. Dr. MacDonald's Opinions About Fairfield's Sleep Deprivation and the Treatment of that Condition ............ 13

E. Dr. MacDonald's Opinions are Reliable as they are Based on his Extensive Experience and on Scientific Studies ............ 17

F. Dr. MacDonald's Opinions Will Assist the Jury ............ 20

CONCLUSION ............ 22

**Brief Summary of the Facts upon which Fairfield's Claims are Based**

On November 8, 2021, Cory Fairfield was admitted to the Waukesha County Jail to begin serving a 160 day sentence. (Joint Agreed Upon Statement of Facts, Dkt 61, p 9.) He suffered from Opiate Use Disorder (OUD) which had first been diagnosed around 2011. (Dkt 61, p 2.) From 2011 – 2018, Fairfield participated in several treatment programs for his addiction, without any lasting success. (Dkt 61, pp 2, 3.) However, in October, 2018, he enrolled in the methadone program at Waukesha Comprehensive Treatment Center (WCTC), and had remained an out-patient and had been opiate-free for three years at the time he began to serve his sentence at the Waukesha County Jail. (Dkt 61, p 3.)

At the time of his admission to jail, Fairfield was a Phase 5 outpatient in the methadone treatment program at WCTC, meaning he had progressed from having to come to the clinic each day to receive his methadone, to his present status where he went to WCTC only once a week, consumed one dose of methadone there, and was given six doses of methadone to take home with him. (Dkt 61, p 4.) He lived and worked in Janesville, and anticipated that very shortly after he was booked into Waukesha County Jail he would be transferred to the Rock County Jail where he would be allowed to serve his sentence on house arrest, permitting him to continue

to go to work and to attend WCTC. (Dkt 61, pp 9-10.) However, this plan hit a snag as the judgment of conviction made no mention of such a transfer, and it ended up taking three weeks to get the paperwork straightened out. (Dkt 61, pp 9-10.) Consequently Mr. Fairfield spent three weeks at Waukesha County Jail. *Id.*

In 2021, the jail did not administer methadone or allow inmates (other than those who were pregnant or who were going out to employment on Huber) to go to a methadone treatment center, so Fairfield's methadone treatment was involuntarily terminated. (Dkt 61, pp 29, 36-37.) That is the basis for Fairfield's claims under the ADA/RA and the Monell claim of deliberate indifference to serious medical needs against the County.

Prior to coming to the jail, Fairfield had been diagnosed by his family physician, Dr. Nathan Gillian, as suffering from psychophysiological insomnia. (Dkt 61, p 15.) During his booking interview upon arrival at the jail, Fairfield disclosed that, among other medications, he was taking Amitriptyline and Rozerem for insomnia. (Dkt 61, p 10.) The pharmacy confirmed that those medications were current. (Dkt 61, pp 12 -13.) Nonetheless, Dr. Brown discontinued those medications, (dkt 61, pp 13, 15, 19), and that is the basis for the deliberate indifference claim against Dr. Brown.

While at the Waukesha County Jail, Cory Fairfield complained repeatedly that he was not sleeping and described what he experienced due to sleep deprivation as hallucinations, his body hurt everywhere, he had headaches, chills, labored

breathing, increased anxiety, poor equilibrium, no concept of time, very blurry vision, confusion, dizziness, inability to think clearly or to concentrate, and feelings of sadness, helpless, and hopeless. (Dkt 61, pp 22-23.) He had what he describes as a complete inability to function. (Dkt 61 p 23.)

After three weeks in the Waukesha County Jail, Fairfield was transferred to Rock County Jail and finished his sentence on house arrest. (Dkt 61, p 22.) When he attempted to return to his methadone program at WCTC, he learned that because he had been off methadone for three weeks, he would have to restart at Phase One, coming to clinic each morning for a daily dose of methadone. (Dkt 61, p 23.) He opted not to do that. (Dkt 61, p 23.) Fairfield's sentence was completed on March 17, 2022. (Dkt 61, p 4.) He was soon using street drugs again, including fentanyl and cocaine. (Dkt 61, p 24.) It was June, 2022, before he began a new methadone program at AMS in Janesville. (Dkt 61, p 24.) His start on the new program was rocky for a few months – it was October, 2022, before he began to test negative for any illicit drugs. (Dkt 61, p 24.) Records from AMS show regular attendance, participation in counseling, and engagement in treatment up through April, 2023, the most recent date of records reviewed for this case. (Dkt 77-1 p 28 ¶ 86.)

## Argument

### I. The Court is the Gatekeeper to Ensure that only Helpful and Reliable Expert Testimony Reaches the Jury.

No Defendant has filed a *Daubert* objection to the admission of the proposed

expert testimony of Dr. MacDonald, but nonetheless, the party who is the proponent of the testimony bears the burden of demonstrating to the Court that its expert's testimony is admissible. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)(internal citation omitted).

"Determining the true facts of a case often requires 'the application of some scientific, technical, or other specialized knowledge.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 808 (7th Cir. 2012) (quoting Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The court's role under Rule 702 is to act as a "gatekeeper," ensuring that proffered expert testimony satisfies these requirements. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Seventh Circuit has condensed Rule 702 gatekeeping into a three part analysis: the court must determine (1) whether the purported expert witness is qualified, (2) whether his or her methodology is reliable, and (3) whether the testimony will assist the jury in deciding a relevant issue. *Myers v. Ill. Cent. R. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

The court first "must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Extensive academic training, practical expertise, or professional experience are all proper bases from which a witness may draw specialized knowledge sufficient to qualify as an expert in a particular area. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). As to the second part of the gatekeeping analysis:

> the test for reliability is necessarily flexible. Although *Daubert* identifies factors the court may consider when determining whether an expert's testimony is reliable—whether the expert's technique has been tested, subjected to peer review and publication, analyzed for known or potential error rate, or is generally accepted—the "list of specific factors neither necessarily nor exclusively applies to all experts or in every case."

*Estate of Robinson ex rel. Irwin v. City of Madison*, No. 15-CV-502-JDP, 2017 WL 564682, at *8 (W.D. Wis. 2017) (quoting *Kumho Tire*, 526 U.S. at 141).

Finally, "expert evidence is relevant if it helps the jury understand a matter beyond the knowledge and experience of a layperson." *Id.* (citing *Daubert*, 509 U.S. at 591-92). "In order to satisfy the requirement of 'helpfulness,' the expert testimony must satisfy two elements. First, the proffered testimony must relate to a fact in issue: 'expert testimony which does not relate to an issue in the case is not relevant, and

ergo, non-helpful.' Second, the proffered testimony must assist the jury in understanding what otherwise might be outside its grasp. Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand." *S.E.C. v. Lipson*, 46 F. Supp. 2d 758, 762-63 (N.D. Ill. 1998)(internal citation omitted).

## II. The Expert Testimony and Opinions of Dr. Ross MacDonald Satisfy the Requirements of Rule 702 and *Daubert*.

The Seventh Circuit has explained: "The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (alteration in original, quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The questions put to Dr. MacDonald were these:

(1) Whether Opioid Use Disorder (OUD) is a serious medical condition;

(2) What is known about OUD as a medical condition and the impacts of medications for opioid use disorder (MOUD)(also known as "Medication Assisted Treatment," referred to as MAT) and incarceration on this condition;

(3) Whether Cory Fairfield suffered from OUD at the time he was incarcerated at the Waukesha County Jail;

(4) The effectiveness and status of any treatment that Cory Fairfield was receiving prior to his incarceration;

(5) The treatment provided to Cory Fairfield while he was in jail;

(6) The effect of the involuntary cessation of MOUD while Fairfield was in jail; and

(7) Whether insomnia/sleep deprivation is a serious medical condition.

(Dkt 77-1, p 1 ¶ 2.)

### A. Dr. MacDonald's Credentials and Expertise

Dr. MacDonald's full credentials are listed in detail in his CV, at dkt 77-2, but briefly, he is a physician who is Board Certified in internal medicine. (Dkt 77-2, p 1, 4.) He is presently the Chief Medical Officer at New York City Health + Hospital/Woodhull in Brooklyn, New York, where he is responsible for overseeing all clinical services at the hospital and serves as an attending physician. (Dkt 77-2, p 1.) He currently also serves as a Clinical Associate Professor of Medicine at NYU Grossman School of Medicine. (Dkt 77-2, p 3.)

Dr. MacDonald previously served as the Chief Medical Officer for the Division of Correctional Health Services at New York City Health + Hospitals, where he was responsible for the medical leadership of the division responsible for healthcare, including substance use treatment, for those incarcerated in the New York City jail system. (Dkt 77-2, pp 1-2) Dr. MacDonald oversaw the opioid treatment program at Rikers Island Jail from 2013 – 2022. (Dkt 77-2, p 2.)

He has testified on many occasions as an expert witness opining on issues related to the treatment for opioid use disorder in jails, most notably in what has become a seminal case on the issue of MOUD in jail, *Brenda Smith v. Aroostook County,*

376 F.Supp.3d 146 (2019), affirmed 922 F.3d 41 (1st Cir. 2019), and more recently in *Cox v. City of Boston,* 734 F. Supp. 3d 173 (D. Mass. 2024).

### B. Dr. MacDonald's Opinions About Opioid Use Disorder and the Treatment of that Condition

In his Report, Dr. MacDonald opined that Opioid Use Disorder is a serious and potentially deadly disease. (Dkt 77-1, p 3 ¶ 1.) Symptoms of OUD include uncontrollable cravings for opioids, loss of control, increased tolerance for opioids, and withdrawal. (Dkt 77-1, p 3 ¶ 1.)

His opinion states that death is the most serious outcome of OUD and is increasingly common in the United States. (Dkt 77-1, p 4 ¶ 2.) However, OUD also causes significant disability to those living with it. (Dkt 77-1, p 4 ¶ 2.) OUD is a chronic disease that can go into remission for prolonged periods of time, but often requires significant patient engagement and healthcare resources to maintain this remission. (Dkt 77-1, p 4 ¶ 2.) Relapse is common, and periods of return to active opioid use carry a high risk of overdose death. (Dkt 77-1, p 4 ¶ 2.) Periods of active use also commonly damage familial relationships, threaten healthy friendships, and destabilize gainful employment and safe housing. (Dkt 77-1, p 4 ¶ 2.) In short, OUD is a serious medical condition that carries a significant burden of death and disability. (Dkt 77-1, p 4-5 ¶ 2.)

Withholding therapeutic medication such as Methadone from someone with OUD

generally triggers symptoms of withdrawal and increases the risk for relapse into active OUD. (Dkt 77-1, p 5 ¶ 3.) Both withdrawal and relapse are serious and potentially dangerous medical conditions. (Dkt 77-1, p 5 ¶ 3.) There is significant suffering associated with withdrawal. (Dkt 77-1, p 5 ¶ 4.) Symptoms of withdrawal include muscle pain, vomiting, diarrhea, depression, insomnia, and anxiety. (Dkt 77-1, p 5 ¶ 4.) Withdrawal symptoms can last up to several weeks. (Dkt 77-1, p 5 ¶ 5.)

Opioid use disorder is a chronic disease, and methadone is a maintenance therapy that many patients are best served to continue indefinitely, similarly to patients taking medications for hypertension or diabetes. (Dkt 77-1, p 14 ¶ 41.) After withdrawal, patients with OUD do not return to their pre-OUD baseline, often experiencing symptoms of OUD such as cravings, which can continue indefinitely. (Dkt 77-1, p 5 ¶ 5.) Withholding medication such as Methadone from someone with OUD will not only lead to withdrawal symptoms, but also increases their risk for relapse into active use. (Dkt 77-1, p 5 ¶ 5.) Relapse into active OUD is a potentially life-threatening condition, and can result in overdose and death, either during incarceration or after release. (Dkt 77-1, p 5 ¶ 6.)

Medication-assisted therapy, using medication such as buprenorphine or methadone, is the standard of care for opioid use disorder. (Dkt 77-1, p 6 ¶ 9.) It is well established in the medical literature that access to opioid medication, including buprenorphine and methadone, reduces the likelihood of overdose and mitigates the risk of death. (Dkt 77-1, p 6 ¶¶ 9, 10; p 9 ¶ 18.)

Methadone is the most established and most effective form of Medication for Opioid Use Disorder (MOUD). (Dkt 77-1, p 13 ¶ 35.)

Forced withdrawal is not medically appropriate for patients being treated with MOUD because it significantly increases the risk of relapse into active OUD and makes patients more likely to suffer from overdose and potential death. (Dkt 77-1, p 9 ¶ 19.) There is a strong body of evidence that forced withdrawal has serious psychological effects and increases the risk of relapse and overdose; post-release overdose risk has been well established in prison and jail data from the United States. (Dkt 77-1, p 9 ¶ 20.)

### C. Dr. MacDonald's Opinions about Cory Fairfield's Condition and his Need for Treatment while in Jail

Dr. MacDonald opined that when Cory Fairfield was incarcerated at Waukesha County Jail, in November, 2021, he had been suffering from opioid use disorder for many years. (Dkt 77-1, p 10 ¶ 25.) He noted that medical records from Mercy Janesville Hospital show that Fairfield had been diagnosed in 2014 with "Opioid use disorder, severe, in sustained remission, on maintenance therapy, dependence." (Dkt 77-1, p 10 ¶ 26.) The part of the notation that says "on maintenance therapy, dependence" indicates that that remission was achieved with continuous use of medication for OUD and that Fairfield has physiologic dependence on that treatment. (Dkt 77-1, pp 11-12 ¶ 28.) "Dependence means that he will suffer adverse effects from stopping this medication including withdrawal symptoms." (Dkt 77-1, p 11 ¶ 28.)

Dr. MacDonald notes that records from Waukesha Comprehensive Treatment Center (WCTC) between April 2018 and November 2021 demonstrate that Cory Fairfield was engaged in methadone maintenance treatment during that period, and he demonstrated excellent attendance at the methadone maintenance program with only 6 absences over the course of several years. (Dkt 77-1, p 13 ¶¶ 33, 34.) Cory Fairfield's records from WCTC also include over 100 toxicology screens completed between October 15, 2018, and July 24, 2021, all of which demonstrate the presence of only metabolites of methadone therapy (as would be expected with proper medication adherence) and the absence of illicit substances. (Dkt 77-1, p 13 ¶ 37.) Dr. MacDonald opines that this is an excellent track record that shows the success of Mr. Fairfield's treatment. (Dkt 77-1, p 13 ¶ 37.)

Patients engaging in opioid treatment programs must demonstrate sustained success and adherence to the medication regimen in order to earn "take home" doses of methadone, which they are trusted to take on their own without supervision from program staff. (Dkt 77-1, p 14 ¶ 40.) That Mr. Fairfield had achieved this status, which WCTC referred to as Phase 5, corroborates his longstanding success in the program. (Dkt 77-1, p 14 ¶ 40.)

Records from Fairfield's 2021 incarceration in the Waukesha County Jail show that he was not treated for his OUD with methadone during his time there, despite his having reported that he was taking methadone. (Dkt 77-1, p 18 ¶ 50.) Dr. MacDonald's opinion is that the "treatment rendered while Cory Fairfield was

incarcerated in the Waukesha County jail subjected him to forced withdrawal from stable methadone therapy, causing him to experience opioid withdrawal, which was compounded by extreme sleep deprivation." (Dkt 77-1, p 15 ¶ 41.) He found the County's policy of allowing only inmates who were working (or pregnant) to receive methadone to be a policy where medical treatment was dependent on employment which he found to represent both a "policy that does not focus on the medical needs of the inmates and a transgression of basic medical ethics." (Dkt 77-1, p 19 ¶ 53.) Dr. MacDonald also opines that forced discontinuation of methadone in the Waukesha County Jail was a major contributor to Cory Fairfield's post-incarceration relapse in an otherwise stable patient. (Dkt 77-1, p 89 ¶ 29.)

### D. Dr. MacDonald's Opinions About Fairfield's Sleep Deprivation and the Treatment of that Condition

Cory Fairfield came to the jail with a pre-existing condition of chronic insomnia for which he had been prescribed medication by his family doctor. (Dkt 77-1, p 25 ¶ 74; p 22 ¶ 64.) Upon Fairfield's arrival at the Waukesha County Jail, Dr. Brown discontinued those medications. (Dkt 77-1, p 22 ¶ 64.) Dr. MacDonald noted that Fairfield's records from the jail contain references to the significant distress Mr. Fairfield experienced as a result of the combined effects of opioid withdrawal and sleep deprivation. (Dkt 77-1, p 19 ¶ 54.)

Dr. MacDonald notes that on November 10, 2021, two days after Fairfield's

arrival at the jail, he told a nurse during a wellness check that he that he had been hallucinating and would not be well if he did not get his meds. (Dkt 77-1, p 19 ¶ 54.) The following day, Fairfield was so upset about not getting his medications that he began banging his head against the window of his cell. (Dkt 77-1, p 19 ¶ 54.) In response to his self-injury, Fairfield was placed in a restraint chair and only removed when he stated "he was done arguing about his medications and would not hit his head anymore." (Dkt 77-1, pp 19-20 ¶ 54.) He was then placed on 15 minute observation status from November 11 until November 15, 2021. (Dkt 77-1, p 20 ¶ 56.)

Dr. MacDonald notes that the correctional officers' logs for those four days "document a truly disturbing degree of sleep deprivation during this time, with periods of wakefulness through every night, not compensated for by periods of sleep during the days. Only a handful of the hundreds of entries noted that he appeared to be asleep, and they document prolonged stretches of wakefulness during every night and day that the log was maintained." (Dkt 77-1, p 20 ¶ 56.) Another report dated November 17, 2021, said that Fairfield had been: "portraying odd behavior throughout the shift," "randomly been singing extremely loud" and when asked to quiet down, "claims that he has not slept for ten days because he's missing a receptor in his brain and demands for his sleeping medication." (Dkt 77-1, pp 20-21 ¶ 57.)

Dr. MacDonald opines that, based on Fairfield's description of the symptoms he experienced, which are objectively confirmed by the documentation in the jail

records, he experienced profound sleep deprivation, a condition that was a serious medical condition. (Dkt 77-1, p 21 ¶¶ 61-62.) He adds that sleep deprivation of this degree "is a serious problem in correctional health that often precedes serious self-injury or suicide," and that any physician working in a correctional setting would be aware of this. (Dkt 77-1, p 22 ¶ 63.) Dr. MacDonald notes that "this profound sleep deprivation was worsened by the sudden discontinuation of Mr. Fairfield's sleep medications, most notably amitriptyline, which itself has a withdrawal syndrome and is not recommended to be stopped abruptly." (Dkt 77-1, p 22 ¶ 64.)

Delving into the record to determine how and why this discontinuation came about, Dr. MacDonald notes that Dr. Brown testified in his deposition that "sleep aids typically are not provided at the Waukesha County Jail." (Dkt 77-1, p 23 ¶ 70.) In answering whether he would prescribe an over-the-counter sleep aid such as an anti-histamine for an inmate, Dr. Brown testified: "I do not use those for sleep because again with medications there's -- you have to use them as indicated. So antihistamines, while they are sedating, they're primarily for treating symptoms from the seasonal allergies." (Dkt 77-1, pp 23-24 ¶ 70.) Dr. MacDonald asserts that Dr. Brown is in error to insist that anti-histamines are not indicated for sleep, as diphenhydramine has been approved by the FDA for this purpose even without the supervision of a physician. (Dkt 77-1, pp 24 ¶ 71.)

When asked why he discontinued amitriptyline in Mr. Fairfield's case, Dr. Brown testified: "Specifically this being a psychotropic medication, we would defer –

or I would defer to our department of psychiatry to determine what would be appropriate," but the record shows no referral to psychiatry by either Dr. Brown or the nursing staff. (Dkt 77-1, pp 22-23 ¶¶ 65-66, 67, 69.) The record reveals that no consideration of the question of the prescribing of these medications occurred beyond Dr. Brown's de facto decision to discontinue them. (Dkt 77-1, p 23 ¶¶ 67, 69.)

Dr. Brown had also asserted that, "There are no sleep aids available," referring to the formulary of permitted medications at the jail. (Dkt 77-1, pp 25 ¶ 73.) Dr. Brown implied that the formulary absolutely limits which medications are available to prescribe, but although formulary medications are preferred at Wellpath, prescribers can request exceptions through a non-formulary request process, a process that Dr. Brown utilized routinely. (Dkt 77-1, pp 25 ¶ 73.) Throughout 2021, records show that Dr. Brown used the process to request and receive permission to use psychotropic medications, but never once requested any sleep medication. (Dkt 77-1, pp 25 ¶ 73.)

Dr. MacDonald concluded that Dr. Brown's practice was to provide no access to treatment for insomnia, and to treat sleep deprivation as a non-serious medical problem which Dr. MacDonald deems an approach unsupported by medical literature, and, in regard to Mr. Fairfield in particular, represented "a proactive and intentional deviation from the practice of his treating physician in the community who had over the years prescribed several medications for this purpose." (Dkt 77-1, p 24 ¶¶ 71, 72.)

Dr. MacDonald opines:

> Dr. Brown's refusal to prescribe any sleep medication for Cory Fairfield, who came to the jail with a pre-existing condition of chronic insomnia, a condition that was exacerbated by his withdrawal from methadone, was not based on his medical judgment, but rather part of a practice simply to not make these medications available. Not making sleep medications available represents a significant deviation from any established standard of care.

(Dkt 77-1 p 25 ¶74.) He concludes:

> Mr. Fairfield was subjected to a complex form of withdrawal from opioids compounded by amitriptyline withdrawal and profound sleep deprivation, which is objectively documented in 15-minute jail observation logs. The sleep deprivation was profound enough to cause hallucinations. The suffering associated with this forced withdrawal was significant and prompted Mr. Fairfield to engage in self-injurious behavior to try to get help, for which he was restrained and isolated. He later had to minimize these symptoms (as described in his deposition testimony) for fear of being kept in segregation even longer.

(Dkt 77-1, p 26 ¶76.)

### E. Dr. MacDonald's Opinions are Reliable as they are Based on his Extensive Experience and on Scientific Studies

Dr. MacDonald based his opinions about the nature of OUD and the involuntary cessation of MOUD while incarcerated on the medical literature detailed throughout his report. (Dkt 77-1, pp 1-2 ¶ 3.) The definition of OUD is taken directly from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V). (Dkt 77-1, pp 10-11 ¶ 26.) In paragraphs 11 – 17 and 22 of his Report, Dr. MacDonald details

studies upon which his opinions are based. Each of the reports predates Fairfield's incarceration in November, 2021.

For example, Dr. MacDonald cites a study published in 2015, Rich, *et al.*, *Methadone Continuation Versus Forced Withdrawal on Incarceration in a Combined U.S. Prison and Jail: A Randomized, Open-Label Trial*, hftp://dx.doi.org/10.1016/S0140-6736(14)62338-2 1 (May 29, 2015). This study compared outcomes for patients who were receiving methadone maintenance treatments for opioid dependence prior to their incarceration at the Rhode Island Department of Corrections. One group was randomly assigned to continue with methadone treatment, and the other group was forced to withdraw from methadone. The study found that the methadone-treatment group was "more than twice as likely" as the forced-withdrawal group to return to treatment at a community methadone clinic within one month of release. The study concluded that "[c]ontinuation of methadone maintenance during incarceration could contribute to greater treatment engagement after release, which could in turn reduce the risk of death from overdose and risk behaviors." *Id.* (Dkt 77-1, pp 7-8 ¶ 14.)

Another study that formed a basis for Dr. MacDonald's opinions was Marsden, *et al.*, *Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death After Release? A National Prospective Observational Study in England*, Addiction 112, 1408-1418 (2017). The study found that medication- assisted treatment provided in prison "was associated with a 75% reduction in all-cause mortality and an 85% reduction in fatal drug-related poisoning in the first month after release." *Id.*

Dr. MacDonald also cites the position statement of the National Commission on Correctional Health Care (NCCHC) released in March of 2021. Therein, the NCCHC explained:

> A robust body of evidence has demonstrated the feasibility and benefits of providing MOUD in correctional settings. There is a striking mortality benefit of providing MOUD in corrections. People leaving prison without MOUD have up to 40 times higher risk of dying from overdose in the first 2 weeks following their discharge than the general population (Merrall et al., 2010; Ranapurwala et, 2018). MOUD significantly reduces post-discharge overdose deaths (Bird et al., 2015; Gisev et al., 2015); one state showed a two-thirds reduction in statewide opioid overdose deaths when its correctional system made MOUD available in custody (Green et al., 2018). A modeling study showed that 1,840 lives could be saved annually if all people with OUD received appropriate MOUD in jails and prisons (Macmadu et al., 2020).

(Dkt 77-1, pp 16-17 ¶ 47.) NCCHC concludes, "Incarcerated people with OUD should not be forced to undergo withdrawal…Forced withdrawal discourages engagement in community treatment, increases the risk for substance use during incarceration, and increases the risk for death after discharge." (Dkt 77-1, p 17 ¶ 47.)

Dr. MacDonald based his opinions about Fairfield's condition and need for MOUD on the information from Fairfield's pre-jail medical records; his Waukesha County jail records, including jail medical records; his medical records following his release from incarceration; as well as the depositions of Fairfield, jail administrators, nurses, and Dr. Brown; and finally the DSM-V and medical literature listed throughout his report. (Dkt 77-1, pp 1-2 ¶ 3.)

As a basis for his conclusions relating to Fairfield's sleep deprivation, Dr. MacDonald points to a 2018 review in the journal Frontiers in Psychiatry Entitled "*Severe Sleep Deprivation Causes Hallucinations and a Gradual Progression Toward Psychosis With Increasing Time Awake*," which documented that: "Symptoms rapidly developed after one night without sleep, progressing in an almost fixed time-dependent way. Perceptual distortions, anxiety, irritability, depersonalization, and temporal disorientation started within 24–48 h of sleep loss, followed by complex hallucinations and disordered thinking after 48–90 h, and delusions after 72 h, after which time the clinical picture resembled that of acute psychosis or toxic delirium." (Dkt 77-1, pp 21-22 ¶ 62.)

### F. Dr. MacDonald's Opinions Will Assist the Jury

There are many commonly held misconceptions about addiction, opioid use disorder, and treatment of OUD. Some of these misconceptions are so widely held that even some physicians display lack of understanding of the issues and the science involved.

Dr. MacDonald noted that Dr. Brown's deposition testimony shows that even he does not understand that a person with a history of opioid use disorder is more susceptible to relapsing into drug use upon release from jail, or that a person maintained on methadone who is allowed to continue methadone through jail has a lower risk of relapse than the same person having been taken off off methadone.

(Dkt 77-1, pp 15-16 ¶¶ 45, 46.) Also Dr. Brown mistakenly believed that treatment for mitigating the symptoms of acute opioid withdrawal is clinically equivalent to avoiding forced withdrawal, apparently failing to understand that the primary purpose of the methadone maintenance therapy is to prevent relapse and overdose death, not to prevent withdrawal. (Dkt 77-1, pp 16-17 ¶ 47.) Additionally, Dr. Brown asserted incorrectly that Mr. Fairfield's risk of overdose would be higher in the community if he were to be enrolled in methadone maintenance than if he were not, whereas "[s]tudy after study for many decades have demonstrated a remarkably reduced (not increased) risk of overdose death with methadone maintenance therapy." (Dkt 77-1, p 17 ¶ 48.)

If even Dr. Brown, a practitioner of correctional medicine, has preconceived misconceptions and "makes assertions that contravene the medical literature and recommendations of national professional organizations" (dkt 77-1, pp 17-18 ¶ 49), then surely the laypeople on the jury, who presumably do not have familiarity with scientific aspects of opioid addiction, would gain a greater understanding of the issues in this case from Dr. MacDonald's testimony and would benefit from his expertise.

Furthermore, Dr. Brown appears to lack of understanding of the serious nature of chronic insomnia and sleep deprivation. Allowing only Dr. Brown's testimony on this issue at trial without the offsetting information provided by Dr. MacDonald would mislead the jury to believe what is contrary to the peer reviewed

medical and scientific literature.

## CONCLUSION

The Plaintiff respectfully requests that the Court permit Dr. MacDonald to testify to the interpretations of fact and the opinions in his Report.

Dated this 15th day of October, 2025

Respectfully submitted,

Cory Fairfield,
Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S. C.
ATTORNEYS FOR PLAINTIFF
Jeff Scott Olson
State Bar Number 1016284
1025 Quinn Drive, Suite 500
Waunakee, WI 53597
Phone (608) 283-6001
Fax (608) 283-0945
Email JSOlson@scofflaw.com

/s/ *Jeff Scott Olson*

Jeff Scott Olson