**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| CORY FAIRFIELD,<br><br>Plaintiff,<br><br>v.<br><br>WAUKESHA COUNTY, ERIC SEVERSON, and TEMU BROWN,<br><br>Defendants. | Case No. 23-CV-873-JPS<br><br>**ORDER** |

## 1. INTRODUCTION

Defendants Waukesha County and Sheriff of Waukesha County Eric Severson ("Severson") (together, "County Defendants") move for summary judgment on Plaintiff Cory Fairfield's ("Fairfield") claims against them under the Americans with Disabilities Act, 42 U.S.C. §§ 12112(b)(5)(A), et seq. (the "ADA"); against them under the Rehabilitation Act, 29 U.S.C. §§ 702, et seq.; and against the County under 28 U.S.C. § 1983 ("§ 1983") related to the refusal to continue Fairfield's methadone treatment while he was incarcerated at Waukesha County Jail ("WCJ"). ECF No. 83. That motion is fully briefed. ECF Nos. 84, 95, 98. Dr. Temu Brown ("Brown") also moves for summary judgment related to Fairfield's § 1983 claims against him for deliberate indifference to his serious medical needs. ECF No. 86. That motion is also fully briefed. ECF Nos. 87, 97, 99. Fairfield also moves to permit expert testimony from Dr. Ross MacDonald ("MacDonald"), ECF No. 76, and R.N. Suzanne Ward ("Ward"), ECF No. 80. Both motions are fully briefed. ECF Nos. 78, 82, 89, 90, 91, 92, 93. Lastly, Fairfield moves for

leave to file a sur-reply to the County Defendants' reply brief in support of their motion for summary judgment to address an argument that Fairfield claims the County Defendants raised for the first time in their reply brief. ECF No. 100. The County Defendants did not respond to this motion and the deadline for doing so has passed; it is therefore also ripe for review.

For the reasons stated herein, the County Defendants' motion for summary judgment will be denied. Brown's motion for summary judgment will be granted, and he will be dismissed with prejudice. Further, Fairfield's motion to permit the expert testimony of MacDonald will be denied without prejudice, and his motion to permit the testimony of Ward will be denied without prejudice. Lastly, Fairfield's motion for leave to file a sur-reply will be granted.

## 2. BACKGROUND

The Court draws the relevant facts primarily from the parties' statement of undisputed facts, ECF No. 85, supplementing from the statement of disputed facts, ECF No. 88, where helpful. The Court begins by noting that, while the parties were to submit a "single, granular, agreed-upon statement of facts" that consisted of "*only material facts* and the *minimum* contextualizing facts," ECF No. 19 at 9 (emphasis added), they instead submitted a 42-page document that contains pages of material that the parties do not utilize or reference in their briefs and that repeats the same facts sometimes four or five times. *See generally* ECF No. 85. The Court has thus endeavored to reduce its own recitation of the facts to what it requested from the parties: a statement of material facts, along with minimum necessary contextualizing facts. For brevity, citations to the facts in this section are omitted in later analysis.

### 2.1 The Parties and Key Players

Fairfield was born in 1977 and had some experience with correctional facilities prior to the events that gave rise to this case. ECF No. 85 at 2. At the times relevant to this case, Fairfield also suffered from chronic back pain and psychophysiological insomnia (a type of sleep disorder that persists over time). *Id.* at 2, 16–17. Wellpath—who is no longer a party to this action, *see* ECF No. 75 and Aug. 1, 2025 docket entry—"is an entity which entered into a contract with Waukesha County to provide certain . . . medical services to the inmates at the Waukesha County detention facilities." *Id.* at 5. Wellpath medical providers "operated at . . . WCJ under protocols established by Wellpath." *Id.* Brown is a physician who, at the times relevant to this case, was employed by Wellpath to provide medical care to inmates at WCJ. *Id.* at 4. Brown's licensure allowed him to prescribe medication. *Id.* at 4–5. Severson was the Sheriff of Waukesha County during the times relevant to this case; his office was responsible for operating WCJ. *Id.* at 5. Waukesha County is a municipality that received federal funds at the times relevant to this case. *Id.*

There are two "separate but related" detention facilities in Waukesha County: WCJ and the Huber facility ("Huber"). *Id.* at 5. Both facilities house inmates and the two are close in proximity. *Id.* WCJ operates as a traditional jail, with inmates being confined to their cells and common areas and not typically permitted to leave, while Huber inmates are permitted to leave the facility for verified employment or to "look for work, engage in childcare, or attend medical appointments." *Id.* at 5–6.

### 2.2 Fairfield's Opioid Use Disorder

Fairfield started using illicitly obtained opiates around 2003 or 2004. *Id.* at 2. Fairfield continued to abuse opiates through 2016, with some intermediate opioid-related prescriptions and treatments. *Id.* at 2–3. In September 2016, Fairfield started a Methadone program at Beloit County Treatment Center and transferred to the program at Waukesha County Treatment Center ("WCTC") in April 2018. *Id.* at 3. "Methadone is a synthetic, narcotic analgesic which is prescribed and used sparingly to relieve chronic pain." *Id.* Methadone is more commonly used to treat Opioid Use Disorder ("OUD"), because it is a synthetic opioid agonist that eliminates withdrawal symptoms and relieves drug cravings. *Id.* When patients are prescribed methadone or similar medications for their OUD, it is called Medication-Assisted Treatment ("MAT"). *Id.* at 4. There are three Federal Drug Administration ("FDA") approved MAT medications: naltrexone, buprenorphine, and methadone. *Id.* at 7 n.4.

Fairfield relapsed in 2017 and 2018, but by October 2018 had reestablished himself at WCTC's methadone program. *Id.* at 3. "Fairfield's records from WCTC demonstrate over 100 toxicology screens completed between October 15, 2018 and July 24, 2021 all of which demonstrate the absence of other illicit substances." *Id.* In November 2021, Fairfield was in Phase 5 of WCTC's methadone program, which was a phase where his methadone doses were "tapering down." *Id.* at 4. At that time, Fairfield was taking 28 mg of methadone daily, which is considered a low dose "relative to the therapeutic doses [that] addicts are typically prescribed." *Id.* at 4. Still, Fairfield had "repeatedly declined to stop using methadone, primarily because he had not identified alternative treatment options for his longstanding chronic pain." *Id.* In Phase 5, patients must only go to WCTC weekly and may take the

other six daily doses home with them. *Id.* If a patient misses more than three doses, however, they must generally restart at Phase 1 and are then required to attend WCTC every day (except Sunday) to receive their methadone dose. *Id.*

### 2.3 Waukesha County Jail's Opioid Policies

Wellpath's protocol for patients who report opiate use is the administration of the Clinical Opioid Withdrawal Scale (COWS), which involves scoring a patient to indicate the severity level of symptoms and determine how to treat the patient suffering from withdrawal. *Id.* at 15, 37–38. Fairfield was not placed in COWS upon intake to WCJ because "he did not report to the nurse any symptoms . . . nor did he exhibit any symptoms of opioid withdrawal." *Id.* at 15.

Per Waukesha County policy, methadone treatment was continued for pregnant inmates because of the risk of miscarriage posed by withdrawal. *Id.* at 18, 38–39 ("Pregnant inmates entering the facility on methadone treatment are continued on treatment whenever possible.").[1] Unemployed "[i]nmates on methadone or similar substances . . . receive appropriate treatment for methadone withdrawal syndrome." *Id.* at 38; *see id.* at 33 ("Only medications authorized and/or prescribed by the jail physician and provided by the medical health authority (or other medications source specifically approved by the health authority), will be administrated to inmates in the [WCJ].").[2] Wellpath had "anti-nausea

[1]The parties' joint statement of facts does not discuss how the County and Wellpath's policies interact, but the following information about Wellpath's policy is agreed: "Wellpath's practice was to refer [pregnant inmates with a history of opioid use] to a local opioid treatment provider." ECF No. 85 at 18.

[2]This section of policy falls within a list of steps for inmates with signs of alcohol dependency, but because (1) it is the only place where inmates who are

medication, antidiarrheal medication, and pain medication such as Tylenol" at WCJ and Huber to "help manage the discomfort of withdrawal." *Id.* at 16. None of those medications treat opioid cravings the way that methadone does. *Id.* *Employed* inmates, however, were permitted, per Waukesha County policy, to "use (start or continue) methadone after it has been verified by contract medical staff." *Id.* at 32.

A former deputy jail administrator testified that "as a matter of scripted policy" unemployed, non-pregnant inmates had their "methadone maintenance programs terminated" when they were "checked into" WCJ, but that there is "nothing scripted in policy stating" that any other medication regime for another illness would be terminated in that way as a matter of course. *Id.* at 40. During 2021, four pregnant inmates who reported taking methadone were transported daily to the methadone clinic to receive their methadone. *Id.* at 41. During that same timeframe, eighteen non-pregnant inmates who reported taking methadone were not transported to methadone clinics to continue their methadone medication. *Id.* Seventeen of the eighteen total reported current illegal use of other drugs. *Id.*

---

taking methadone "or similar substances," ECF No. 85 at 38, are mentioned and (2) testimony from a prior jail administrator refers to this discontinuation of methadone as "scripted policy" for non-pregnant inmates, the Court will infer to the non-moving party's benefit that this policy applied to any inmate at WCJ that was taking methadone. *Id.* at 40. Further, Brown testified that in November 2021, he could not send a non-pregnant inmate out to a methadone clinic to continue receiving methadone treatment. ECF No. 96-11 at 56:2–56:10 ("Q: . . . Today, you can decide whether an inmate who comes into the jail and is a current participant in the local methadone maintenance clinic can continue that participation while in the jail or not; right? A: Correct. Q: And you could not do that in November of 2021; correct? A: Correct.").

### 2.4 Fairfield's Conviction and Intake at Waukesha County Jail

On March 22, 2019, Fairfield was arrested for his third operating while intoxicated ("OWI") charge and was booked into WCJ. *Id.* at 10. On November 8, 2021, Fairfield pled guilty to the OWI offense and was sentenced to 160 days in jail. *Id.* at 11. Fairfield had anticipated booking into WCJ then promptly transferring to the Rock County Jail to serve his sentence on house arrest, "but this did not initially happen because the original Judgement of Conviction" did not explicitly permit transfer to another county. *Id.* Fairfield was thus incarcerated at WCJ from November 8, 2021 to November 21, 2021. *Id.* at 5.

When a person is booked into WCJ they undergo a process with a correctional intake officer that includes the completion of a Waukesha County Sheriff Inmate Medical/Mental Health History ("Medical Screening Form"). *Id.* at 10. "The Medical Screening Form contains questions related to medical and mental health care, suicidality, and is used to obtain information, *inter alia*, identifying the name of the inmate's physician, the pharmacy where they fill their medication prescriptions, and to uncover other pertinent medical or mental health issues." *Id.* To complete the form, a correctional officer asks the inmate a series of questions and then fills out the form based on those answers; the correctional officer also answers certain questions based on observations of the inmate. *Id.*

When booked into WCJ after his sentencing hearing on November 8, 2021, Fairfield underwent this process to complete a new Medical Screening Form. *Id.* at 11. Fairfield disclosed that he was prescribed the following medications: 50 mg of Amitriptyline twice nightly for insomnia, 10mg of Rozerem once nightly for insomnia, 28mg of Methadone once daily for opioid addiction, and an allergy medication. *Id.* Fairfield indicated that the last time he had taken his medications was November 7, 2021 (the day before his sentencing), but at his deposition Fairfield confirmed that he took his

Methadone on November 8, 2021, before his sentencing hearing. *Id.* The intake interview[3] lists Fairfield's pharmacy as "Hometown in Janesville" and his physician as "Dr. Nathan Gill." *Id.* Fairfield denied having a history of drug or alcohol withdrawal, being under the influence of drugs or alcohol, or using synthetic drugs that week. *Id.* at 11–12. He also denied having any major problems, including medical or personal problems, and having any additional medical or mental health concerns that were not already addressed by the form. *Id.* at 12. The correctional officer who completed Fairfield's Medical Screening Form noted that "Fairfield had no tremors, was not sweating abnormally, and did not show signs of alcohol or drug use or withdrawal." *Id.*

The Medical Screening Form did not state where Fairfield obtained his methadone—i.e., that he received it from WCTC rather than from a pharmacy—nor did the form identify the WCTC physician who prescribed Fairfield his Methadone. *Id.* Fairfield noted in later testimony that "at WCTC, the patients interact primarily with the nurses who dispense the medication and the counselors with whom they have regular appointments, and almost never see the physician who prescribes the medication." *Id.* Because Fairfield did not provide the prescribing doctor or pharmacy for his methadone during his intake interview, Fairfield's methadone prescription was not immediately verified. *Id.* at 15. A Wellpath nurse testified, however, that "it was easy for a nurse to ask an inmate for additional information in order to verify their information, and this was not unusual." *Id.*

---

[3]Because the parties do not cite to anything in the record to support the facts contained in their statement of undisputed facts, *see generally* ECF No. 85, it is unclear whether by "intake interview" the parties mean to reference the Medical Screening Form or some other notes related to the intake process and completion of that form.

Later that day, Fairfield was assessed by a Licensed Practical Nurse at WCJ. *Id.* at 12. During that assessment, Fairfield's vitals were normal and he did not exhibit any "problematic physical symptoms which would have required additional care or . . . any specific follow-up." *Id.* at 12–13. Fairfield again denied a history of drug or alcohol withdrawal and disclosed that he was taking 28 mg of Methadone daily. *Id.* at 13.

**2.5 Dr. Brown's Prescription Decisions**

Wellpath medical staff working at WCJ utilize the Medical Screening Form to determine if a patient has any acute medical needs and to obtain information about an inmate's medical history and medications. *Id.* at 13. Wellpath nurses utilize a completed Medical Screening Form to verify an inmate's medications by calling the disclosed pharmacy and obtaining a list of current medications. *Id.* at 14. The verified medications are then entered into a Medication Verification Data Sheet, used to consult with the physician to determine which verified prescriptions will be continued for the inmate. *Id.* On November 9, 2021, a nurse contacted Hometown Pharmacy to verify Fairfield's listed prescriptions. *Id.* Hometown Pharmacy provided a list of Fairfield's current medications. *Id.* Included in that list was, inter alia, 50 mg of Amitriptyline twice nightly and 8 mg of Rozerem on an as needed basis (or "PRN"). *Id.* at 14, 18.

Brown was the physician who was consulted about Fairfield's continuation of prescriptions. *Id.* at 14. Brown continued two verified prescriptions for Fairfield, the specifics of which are not relevant here, but discontinued Rozerem and Amitriptyline because he did not believe that they were indicated. *Id.* Brown "did not make any effort," however, "to learn how serious [Fairfield's] sleep difficulties had been" before discontinuing these medications. *Id.* Brown did not contact Fairfield's

community physician "to obtain additional information as to the reason for the prescription or the seriousness/insignificance of the condition for which Amitriptyline and Rozerem had been prescribed. Nor did . . . Brown order the nursing staff to gather additional information." *Id.* at 18.

As to the Amitriptyline, Brown "considered its primary use to be as treatment for depression, so he deferred the question of its continuation to the psychiatry department of the jail." *Id.* at 14. But he did not make a referral to the psychiatry department. *Id.* Amitriptyline is not FDA-approved to treat insomnia, though it can be prescribed off-label for that purpose. *Id.* at 17. "Although Amitriptyline is an anti-depressant it has sedative qualities." *Id.* at 21. Brown discontinued Fairfield's prescription for Amitriptyline without slowly reducing his dosage or ordering any medication to ease Fairfield's withdrawal from its discontinuance. *Id.* While Brown was aware of Wellpath's policies regarding sleep aides,[4] "he asserts that his prescribing decisions were primarily determined by his clinical judgment." *Id.* at 18–19.

During Brown's consultation about Fairfield's prescriptions on November 9, 2021, "he was not provided any information indicating [that] Fairfield was prescribed methadone as it was never a verified medication." *Id.*

---

[4]"When an inmate arrives at . . . WCJ with and self-reports being on medication for insomnia, it is not the custom of Wellpath to expect its physician to make any inquiry of the patient's community doctor to learn the basis of that prescription or the seriousness of the underlying insomnia." ECF No. 85 at 41. "Typically, Wellpath did not treat patients' sleep issues with sleep aid medication. Rather, Wellpath tried to look for other ways to manage difficulty sleeping in the jail environment." *Id.* at 16. Amitriptyline was also not on the Wellpath formulary, but Brown was able to, and "on many occasions" did, obtain an override order to prescribe a medication that was medically necessary but was not in the Wellpath formulary. *Id.* at 21, 40.

at 15. Brown was also "never made aware that Fairfield was suffering any withdrawal symptoms, chronic pain, or sleep difficulties at WCJ." ECF No. 85 at 15–16.

### 2.6 Huber Policies and Fairfield's Brief Time at Huber

Unlike inmates at WCJ, Huber inmates are permitted to leave the facility for, inter alia, verified employment and medical appointments. *Id.* at 19.

> To verify employment for the purposes of Huber, there is a form that the inmate fills out as part of their booking process or when they become employed which lists the place of employment and the employer's contact information. Once the form is filled out, correctional staff or the Huber accounting staff verify the legitimacy of the business and speak with the employer to confirm the inmate is an employee and the work schedule. . . . To verify medical appointments, Huber inmates prepare a Pass Request containing information on where they are going, the date of the appointment, the time, and who to contact. Medical or correctional staff would then call to verify the inmate has a valid appointment.

*Id.* Waukesha County policy dictates that Wellpath prescribe all the medications for WCJ and unemployed Huber inmates but employed Huber inmates were "permitted to bring their verified prescription medications to . . . Huber . . . to be administered by the jail staff." *Id.* at 19–20, 29, 32–33.

On November 10, 2021, Fairfield was assigned housing at Huber and that same day his employment was verified. *Id.* at 19–20. Fairfield would have been permitted to attend work and his methadone appointments starting on November 11, 2021, but his Huber privileges were suspended. *Id.* at 20. He was returned to WCJ the same day he was assigned to Huber because he pled guilty to smoking a vape cigarette, in violation of Huber rules. *Id.*

### 2.7 Fairfield's Remaining Time at WCJ

Fairfield was transferred back to WCJ from Huber in the evening on November 10, 2021. *Id.*

> At approximately 8:00 p.m. on November 10, 2021, Fairfield became agitated because he wanted his personal medications and was threatening to bang his head against the cell window. [WCJ's] Health Services Administrator Mathews and then [another WCJ employee] attempted to talk to Fairfield; however, Fairfield continually interrupted, became increasingly agitated, and started to hit his head on the cell window while begging for his medication. After the correctional staff threatened to forcibly enter his cell to gain his compliance, and officers were lined up outside his cell prepared to make entry, Fairfield indicated he would comply with orders. He was handcuffed, transferred to a restraint chair, and secured. He was removed from the restraint chair when he was calm, stated he was done arguing about his medications, and would not hit his head anymore.

*Id.* at 20–21. Following the headbanging incident, Nurse Tess-Barber physically assessed Fairfield while he was in the restraint chair and noted that his assessment was normal, apart from some bumps on his head. *Id.* at 22. A few hours later Health Services Administrator Mathews ("HSA Matthews") came by; Fairfield asked him for ibuprofen because he had a headache, and HSA Mathews provided Fairfield with a 5-pack of Tylenol. *Id.* HSA Mathews also performed a neurological check on Fairfield at that time and noted that "everything was within normal limits." *Id.*

> Fairfield was placed in a Mental Visible Observable Cell . . . and on Administrative Segregation and placed on a 15-minute watch status that required physical well-being observation checks by correctional officers. The observations were recorded on an Inmate Special Check Sheet approximately every fifteen minutes. Fairfield was kept on this status from November 10th until November 15th. During that period of

> time, the [Special] Check Sheet documents that Fairfield rarely slept.

*Id.* at 21.

On November 12, 2021, Fairfield underwent a Mental Health Initial Assessment. The assessment notes reflect that Fairfield "appeared anxious, agitated, and fearful and showed symptoms of depression." *Id.* at 22. It also recorded that Fairfield was upset that he hadn't received his medication and reported withdrawing and not sleeping for five days. *Id.* The notes conclude that Fairfield would remain in a maintain visual observable cell "due to current presentation and complaining of hallucinations." *Id.* Fairfield was then referred for a mental health follow-up in one week. *Id.*

On November 16, 2021, Nurse Zerbst saw Fairfield to obtain his medical history and conduct a physical assessment. *Id.* Fairfield reported dizziness and auditory hallucinations at that time. *Id.* at 22–23. Nurse Zerbst questioned Fairfield about those symptoms, and he indicated that they were a "result of not being able to sleep." *Id.* at 23. Fairfield also reported that everything hurt him at that time. *Id.* Fairfield's vitals were within normal limits apart from his blood pressure being slightly elevated (Fairfield was receiving medication for hypertension at that time). *Id.* Nurse Zerbst also documented that, when Fairfield entered the room, he had a "forced gait" and appeared to be unable to walk. *Id.* He also complained of musculoskeletal pain, dizziness, and trouble ambulating. *Id.* Nurse Zerbst told Fairfield that, due to his hallucinations, he would be unable to return to Huber and would need to remain at WCJ under observation instead. *Id.* "As soon as he heard this, Fairfield changed his story, and explicitly denied having any hallucinations." *Id.* Fairfield later explained that "he would have said anything [at that point] to get back to Huber so he could have his

medication." *Id.* Fairfield was given Acetaminophen for body aches. *Id.* After the assessment, Fairfield "got off the exam table and ambulated out of the room with an unassisted, steady gait." *Id.*

"On November 17, 2021, a Wellpath mental health professional reported that Fairfield was eating and drinking, and his mood, manner, and appetite were all appropriate." *Id.* The professional reported no concerns about Fairfield self-harming or about his ability to perform the activities of daily living. *Id.* at 23–24.

On November 18, 2021, Fairfield "reported to Wellpath,"—it is unclear how or to whom—that he was "through withdrawal and feeling much better" but also that he was "exhausted and hadn't slept much." *Id.* at 24. Fairfield was cleared that day by mental health to return to Huber. *Id.*

On Friday, November 19, 2021, Fairfield sent two Huber-Request for Pass Forms: one seeking release for work, the other seeking release to go to WCTC for his methadone treatment. *Id.* As to the work release form, Correctional Officer Cull ("CO Cull") responded that Fairfield needed his employment to be verified and that the accountant who verified work would be back in on Monday and would contact Fairfield then. *Id.* As to his methadone treatment request, CO Cull responded that they "need[ed] to be able to verify the appointment. If going to be regular appointment, write medical and get up permanent pass." *Id.*

On November 20, 2021, Fairfield completed another Employment Verification Form, and he sent in a "Request for Medical/Mental Healthcare," asking for his methadone clinic appointments to be verified and to be provided with a permanent pass for those appointments. *Id.* This was the first time that Fairfield provided any Wellpath employee with the information about where he obtained his methadone. *Id.*

On November 21, 2021, Nurse Tess-Barber sent a fax to WCTC trying to verify Fairfield's methadone treatment. *Id.* She wrote back to Fairfield that same day indicating that she had requested the information and they were awaiting reply from WCTC. *Id.*

On November 23, 2021, Fairfield sent a WCJ Inmate Communication Form "stating that he 'could care less' about his methadone prescription but that he wanted his 'private doctor prescribed medications' for sleep." *Id.* at 25.

On November 24, 2021, Fairfield provided someone at Wellpath the contact information for WCTC. *Id.* It is unclear to whom he provided this information and how he did so. *See id.* (merely stating that Fairfield "communicated to Wellpath" the information). Fairfield again sought release for methadone treatment that day. Someone from Wellpath responded that "he could not go [to his methadone treatment appointments] if his employment had not been verified." *Id.*

At no point during his incarceration at WCJ was Fairfield provided with his methadone or prescription sleep medication. *Id.* Fairfield did not file a grievance about his access to medication or his medical treatment during that time.[5] *Id.*

> Fairfield describes what he experienced due to withdrawal symptoms as stomach pain, bone/joint pain, muscle pain,

---

[5]The parties agree that "Plaintiff signed an acknowledgment on November 8, 2021 confirming he knew how to access WCJ's and Huber Facilities' Inmate Rule, Regulations and Information Packet . . . and that he was responsible for complying with the same." ECF No. 85 at 13. The parties do not, however, explain whether the grievance process was described within that packet or whether Plaintiff had any knowledge of the grievance process. *See generally, id.* Because the parties do not address this point, the Court infers, in Plaintiff's favor, that Plaintiff did not receive information on WCJ's or Huber's grievance processes.

> headaches, nausea, and vomiting three to four times, loss of appetite, confusion, hot and cold flashes, sweating, dehydration, and weight loss and a craving for opiates.
>
> Fairfield describes what he experienced due to sleep deprivation as hallucinations, his body hurt everywhere, he had headaches, chills, labored breathing, increased anxiety, poor equilibrium, no concept of time, very blurry vision, confusion, dizziness, inability to think clearly or to concentrate, and felt very sad, helpless, and hopeless. He had what he describes as a "complete inability to cope of [sic] function."

*Id.* at 25.

### 2.8 Fairfield After His Release from WCJ

Fairfield was transferred to Rock County Jail on November 29, 2021. *Id.* 25–26. That same day, Fairfield stopped at WCTC and learned that "because he missed three doses, he would need to restart the program at Phase One," requiring that he go to WCTC daily for his medication. *Id.* at 26. Fairfield was unable at that time to go to WCTC daily, due to his "work obligations and location, and the location of WCTC," so he opted not to restart the program. *Id.*

### 2.9 National and Statewide MAT Statistics

The United States Bureau of Justice conducted a nationwide survey of jails in 2019, which found that "less than one quarter of U.S. jails provided continuation of MAT services to individuals who booked into jail who were participating in MAT programming prior to booking." *Id.* at 6 (citing Laura M. Maruschak, Todd D. Minton, and Zhen Zeng, PhD., *Opioid Use Disorder Screening and Treatment in Local Jails*, 2019 (NCJ 305179), U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS, BUREAU OF JUST. STATS., https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/oudstlj19.

pdf [https://perma.cc/P6EZ-KJ3J] (April 2023)). The Wisconsin Department of Health Services published a study that collected information on MAT in Wisconsin jails and prisons during 2019. *Id.* at 7 (citing *Report on Medication Assisted Treatment in Prisons and Jails,* WIS. DEP'T OF HEALTH SERVS., https://www.dhs.wisconsin.gov/publications/p02910-21.pdf [https://perma.cc/E7QJ-X28B] (Apr. 1, 2021) (Wisconsin Study)). The Wisconsin Study noted that MAT is "[t]he gold standard and most effective therapy" for OUD. Wisconsin Study at 2. Of the (85% of) Wisconsin jails that responded to the survey, only 41% provided MAT (any FDA-approved OUD medication) at their facilities. ECF No. 85 at 8; Wisconsin Study at 7–8. Of those jails that did offer MAT, only 3 offered methadone. Wisconsin Study at 8; ECF No. 85 at 8. Wisconsin's prison facilities had even lower rates of offering MAT and, specifically, methadone. Wisconsin Study at 8–9 (only 5 of 35 facilities offered MAT and none offered methadone). The Wisconsin Study only collected data about facilities offering MAT to inmates within the jail or prison, not whether any facilities permitted inmates to leave to receive MAT, as was permitted at Huber and for pregnant inmates at WCJ. Wisconsin Study at 5–10; ECF No. 85 at 9–10.

The Wisconsin Study also indicated that Wisconsin began a MAT pilot program in April 2016 that provided naltrexone[6] to inmates with OUD. Wisconsin Study at 14. The Wisconsin Department of Corrections removed the "pilot" designation in July 2020 and expanded the program into several

[6]The Wisconsin Study refers to Vivitrol, which is the brand name under which the generic drug, naltrexone, is sold. *See* Naltrexone (Vivitrol), NAT'L ALLIANCE ON MENTAL ILLNESS, https://www.nami.org/treatments-and-approaches/mental-health-medications/types-of-medication/naltrexone-vivitrol/ [https://perma.cc/6N3Z-RUTP] (last visited Aug. 10, 2026).

additional counties, including Waukesha County. *Id.* at 15. That expansion also brought with it a move to "contracting services that allow for Methadone and Buprenorphine treatments when deemed appropriate and closely monitored by a medical provider." *Id.* The 2020 Wisconsin Study was driven by 2019 Wisconsin Act 119, which required a study, report, and pilot facilities related to jails and prisons providing all three FDA-approved medications for OUD to inmates. *Id.* at 5; 2019 WIS. ACT 119 § 4. The timeline for actual implementation of the pilot facilities, however, was anticipated to be sometime in 2022. *See* ECF No. 85 at 9; Wisconsin Study at 19.

## 3. EXPERT TESTIMONY

Fairfield moves to permit his expert witnesses, MacDonald and Ward, to testify to the opinions provided in their respective expert reports. ECF Nos. 76 and 80. The focus of the parties' summary judgment briefs, however, largely rely on agreed facts and varied interpretations of the fact to the law; they do not revolve around expert opinions. The Court will accordingly consider MacDonald and Ward's reports to the extent they contribute to the statement of facts section above, *supra* Section 2, and as necessary to rule on summary judgment. It will otherwise deny Fairfield's motions without prejudice, allowing the parties to more concretely narrow the relevant opinions and issues for trial and (again) move to bar or permit witness testimony once those issues have been narrowed.

## 4. SUMMARY JUDGMENT

### 4.1 Legal Standard

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing FED. R. CIV.

P. 56(a) and *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). Instead, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001) (citing *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001)).

### 4.2 Dr. Brown's Motion for Summary Judgment

Brown moves for summary judgment, seeking dismissal of the § 1983 claim based in the Eighth Amendment for Brown's alleged deliberate

indifference to Fairfield's serious medical need. ECF No. 87 at 1–2. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Brown's motion for summary judgment on the merits.

To prove that Brown violated his rights under the Eighth Amendment, Fairfield must present evidence establishing that he suffered from "an objectively serious medical condition" and that Brown was "deliberately, that is subjectively, indifferent" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison or jail medical provider shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)).

"A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). On the other hand, prison medical staff "that refuse[] to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—

does not by [their] refusal violate the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

The Eighth Amendment tolerates a range of acceptable courses for medical professionals and does not entitle an incarcerated individual to their preferred treatment or prescription. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). An incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Brown's motion for summary judgment, Fairfield must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662. The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood*, 836 F.3d 800, 805–06 (7th Cir. 2016)). This contrasts a case "where evidence exists that the defendant knew better than to make the medical decision that he did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016)). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry*, 604 F.3d at 441 (7th Cir. 2010).

Brown argues that Fairfield's insomnia was not an objectively serious medical need because he has alleged only discomfort and restlessness. ECF No. 87 at 7–8 (citing *Choi v. Rustad,* No. 20-cv-953-wmc, 2022 WL 157811, at *2 (W.D. Wis. Jan. 18, 2022)). Brown contends that Fairfield has offered no evidence to suggest that Fairfield's insomnia caused him any pain, but that instead any symptoms he experienced were the result of his withdrawal from methadone. *Id.* at 8–9 (citing ECF No. 1 and ECF No. 85 at 25). The fact that Fairfield's pain continued even after he left custody and was provided his insomnia medication is evidence, according to Brown, that Fairfield's symptoms were not caused by his insomnia. *Id.* at 9 (citing ECF No. 85 at 26).

Fairfield responds that the record supports his insomnia as a diagnosed, chronic condition that he had been using medication to treat for many years.[7] ECF No. 97 at 4–6 (citations omitted); *see also* ECF No. 88 ¶ 30 ("Fairfield experienced problems with sleep and received medication to

---

[7]While Defendants dispute that Fairfield's proffered evidence demonstrates that he was "diagnosed" with insomnia when the doctor's notations "are not obviously diagnostic in quality—i.e. 'establishing care,'" ECF No. 97 ¶ 31, the Court considers this argument forfeited, because Defendants also agreed to the following fact: "Fairfield had a prior condition of psychophysiological insomnia before he entered the jail." ECF No. 85 at 16.

assist him in sleeping since at least 2014.") (citation omitted); *id.* ¶ 31 ("Fairfield had been diagnosed with [psychophysiological] insomnia since at least 2019.") (citation omitted). Fairfield also points out that his expert, MacDonald, "who reviewed all of Fairfield's past medical records as well as the medical records from Fairfield's 2021 stay in the Waukesha County Jail, opined that Fairfield experienced 'profound sleep deprivation' while at the jail, which he characterized as very serious." ECF No. 97 at 5 (quoting ECF No. 88 ¶ 18). This sleep deprivation caused hallucinations: "[t]he suffering associated with this forced withdrawal was significant and prompted . . . Fairfield to engage in self-injurious behavior to try to get help . . . ." *Id.* at 6 (citing ECF No. 77-1 ¶ 76). Because the parties provide very little legal support for their positions, and because the issue is ultimately not dispositive here, the Court will assume for the purposes of this Order that there is a genuine issue of material fact as to whether Fairfield suffered from an objectively serious medical condition. Summary judgment will thus be inappropriate if there is also a genuine issue of material fact as to the second prong of deliberate indifference, namely, whether Brown was deliberately indifferent in addressing Fairfield's insomnia.

Brown argues that no reasonable juror could find, based on the record, that he was deliberately indifferent. For this prong, the Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee*

*County*, 163 F.3d 982, 988 (7th Cir. 1998)), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson*, 433 F.3d at 1013. Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe*, 631 F.3d at 857; *Burton*, 805 F.3d at 785.

> But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision. When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted.

*Zaya*, 836 F.3d at 805.

The facts in the record demonstrate, at best, that Brown was negligent in failing to provide Fairfield one of his requested insomnia medications, Amitriptyline. Deliberate indifference requires "[s]omething more than negligence or even malpractice." *Pyles*, 771 F.3d at 409 (citing *Duckworth*, 532 F.3d at 679). "'[D]eliberate indifference' is a synonym for 'intentional or reckless conduct,' and 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Enge v. Obaisi*, No. 13 C 5154, 2016 WL 1359368, at *2 (N.D. Ill. Apr. 6, 2016) (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)).

The Court cannot draw this inference based on the facts present here. Because Brown was not made aware of Fairfield's sleeping difficulties or other symptoms, the only relevant treatment decision here is Brown's initial decision to discontinue Fairfield's prescription for Amitriptyline,[8] which Fairfield was prescribed to help with his insomnia. But Fairfield has presented nothing to meaningfully counter Brown's assertion that he made this decision based upon his medical judgment and because insomnia was an off-label use for Amitriptyline. While it is true that Brown was perhaps negligent in failing to inquire of Fairfield's community physician about the seriousness of Fairfield's insomnia and/or the purpose of his Amitriptyline prescription, this decision does not rise to the level of disregarding a substantial risk of harm. *Petties*, 836 F.3d at 728 ("[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." (citing *Farmer*, 511 U.S. at 837)).

"[T]he question of whether a defendant was deliberately indifferent must logically depend on what information was available to the defendant at the time that a decision was made." *O'Brien v. Ind. Dep't of Corr. ex rel. Turner*, 495 F.3d 505, 509 (7th Cir. 2007). When Brown decided to discontinue Fairfield's prescription for Amitriptyline, he had no knowledge of the severity of Fairfield's insomnia. And Fairfield has provided nothing

---

[8]As Brown points out in his reply brief, Fairfield abandons his claim that Brown was deliberately indifferent for discontinuing Fairfield's access to his additional prescription for insomnia, Rozerem. ECF No. 99 at 2 n.1; *see generally* ECF No. 87 (Fairfield's opposition brief, nowhere mentioning Rozerem); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver." (citing *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008) and *Williams v. REP Corp.*, 302 F.3d 660, 667 (7th Cir. 2002))).

beyond conjecture to suggest that Brown was aware that discontinuing Amitriptyline for a patient prescribed it for insomnia could lead to severe side effects.

Perhaps Brown exercised poor judgment in failing to inquire about Fairfield's insomnia further, in failing to prescribe a medication to assist with its immediate discontinuation, or in failing to directly refer Fairfield's prescription for Amitriptyline to a mental health professional, but "[e]xercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to [a prisoner's] safety." *O'Brien*, 495 F.3d at 510 (citing *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (further citation omitted)). Fairfield has not provided evidence from which a reasonable juror could find that Brown's care was "blatantly inappropriate" or that his decision to discontinue Amitriptyline was one that "no minimally competent professional would have" made. *Pyles*, 771 F.3d at 409 (first quoting *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) then quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

On this record, the Court finds that no reasonable juror could find that Brown was deliberately indifferent to Fairfield's objectively serious medical needs. The Court will accordingly grant Brown's motion for summary judgment on the merits.

### 4.3 Waukesha County and Eric Severson's Motion for Summary Judgment

Fairfield has sued the County Defendants for alleged violations of the ADA and the County for violations of his Eighth Amendment rights pursuant to § 1983. For the reasons discussed below, the County Defendants' motion will be denied.

#### 4.3.1 ADA Claim[9]

A plaintiff alleging a violation of Title II of the ADA "must prove that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *Wagoner*, 778 F.3d at 592 (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)) (internal quotation marks omitted); *see also* 42 U.S.C. § 12132.

The County Defendants first argue that Fairfield's claims are not properly brought under the ADA but rather must be brought as Eighth Amendment claims under § 1983. ECF No. 84 at 3 (citing *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996)). Fairfield responds that the ADA applies to jails and that medical treatment can be considered a service that prisoners must receive indiscriminately pursuant to the ADA. ECF No. 95 at 10–11 (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10 (1998); *United States v. Georgia*, 546 U.S. 151, 157 (2006)[10]; and *Corbin v. Indiana*, No. 3:16CV602-PPS/MGG, 2018 WL 1920711, at *3 (N.D. Ind. Apr. 23, 2018)). County

---

[9]Because an ADA claim requires the same analysis as a Rehabilitation Act claim, *McDaniel v. Syed*, 115 F4th 805, 822 (7th Cir. 2024) (citing *A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018)), the Court will discuss only the ADA claim and will consider Fairfield's Rehabilitation Act claim to be disposed of in the same manner. *Wagoner v. Lemmon,* 778 F.3d 586, 592 (7th Cir. 2015) ("The Rehabilitation Act is functionally identical [to the ADA]" but only applies to state agencies that accept federal funds, "which all states do" for their prisons (citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012))).

[10]*United States v. Georgia* does not support Fairfield's claim that medical treatment can be considered a service under the ADA, because in *Georgia*, the Supreme Court did not address the merits of the plaintiff's claims; what's more, the defendant did not dispute that "the same conduct that violated the Eighth Amendment also violated Title II of the ADA." 546 U.S. 151, 157 (2006) (citation omitted).

Defendants are "correct when [they] assert[] that a claim for inadequate medical treatment would not qualify as a violation of the ADA," Fairfield notes, "[b]ut a claim that a prisoner was denied access to medical treatment where such access is provided to other prisoners who are not disabled is a valid claim under the ADA." ECF No. 95 at 13.

The Court disagrees that Fairfield's claim can only be characterized as an Eighth Amendment claim rather than an ADA claim. It is true that "[a]s a general matter, the ADA and the Rehabilitation Act do not apply to issues of allegedly inadequate medical treatment." *McDaniel*, 115 F4th 805, 825 (7th Cir. 2024) (citing *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 486 n.6 (7th Cir. 2019) and *Bryant*, 84 F.3d at 249); *Bryant*, 84 F.3d at 249 ("a prison's simply failing to attend to the medical needs of its disabled prisoners" is not actionable under the ADA). However, Fairfield does not merely allege that he received inadequate medical care; he alleges—and the record supports a reasonable inference—that County Defendants did not take steps to provide him with his prescribed methadone due to his particular disability (OUD). *See McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) (holding that plaintiff's ADA claim survived summary judgment based on his theory that the defendant "discriminated against [p]laintiff because of his HIV-positive status . . . by denying him immediate access to prescribed medications, a service provided to detainees in need of prescriptions for other illnesses"); *Est. of Crandall v. Godinez*, No. 14-cv-1401, 2015 WL 1539017, at *6 (C.D. Ill. Mar. 31, 2015) ("Plaintiff could plead a plausible claim under the ADA if he pleaded that Defendants deprived [him] of access to medical services that were available to other inmates."). The Court discusses this further below but makes this

point here to dispose of County Defendants' threshold argument that such a claim cannot be brought under the ADA.

**4.3.1.1 Qualified Individuals with A Disability**

A "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual" is a qualifying disability for purposes of the ADA. 42 U.S.C. § 12102(1)(A). "In assessing whether a particular condition constitutes a disability for purposes of [the ADA], the Supreme Court has instructed [that courts] conduct a three-step inquiry": (1) "determine whether [the plaintiff's] condition is a physical or mental impairment"; (2) "identify an affected life activity and determine whether it constitutes a 'major life activity' for purposes of the ADA"; and (3) "determine whether the plaintiff's impairment was a substantial limit on the identified major life activity." *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950–51 (7th Cir. 2000) (citing 42 U.S.C. § 12102; *Bragdon v. Abbott*, 524 U.S. 624, 631, 637–38, 639 (1998)). Notably, the ADA provides that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter" and "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(A) and (D).

County Defendants argue that Fairfield has not established that he was a qualified individual under the ADA. ECF No. 84 at 5–9. Fairfield alleges that he is disabled due to OUD, but County Defendants contend that Fairfield "cannot establish that he was diagnosed with" OUD, and even if he could, "he has failed to show that his OUD substantially limited him in

major life activities."[11] *Id.* at 9. County Defendants do not interact with the steps for determining a qualifying disability as to Fairfield's OUD. *See generally id.*

Fairfield responds by arguing that "[t]he record is replete with evidence that establishes that Fairfield suffered from opioid addiction . . . ." ECF No. 95 at 6–7 (citing ECF No. 85 at 2–3, 10 and ECF No. 88 ¶ 26); *see* ECF No. 85 at 2–3 (agreed statement of facts from the parties, describing Fairfield's extensive history with abusing opiates and multiple attempts at detoxing through MAT programs and other attempts). Fairfield also states that Defendants "conceded" that he suffered from OUD by agreeing to the following fact: "In November of 2021, Fairfield was in Phase 5 at WCTC, taking 28 mg of methadone daily ***for his opioid addiction***." ECF No. 95 at 7 (citing ECF No. 85 at 4); *but see* ECF No. 98 at 3 (County Defendants' reply, noting that they did not agree that Fairfield had OUD which is "an official diagnostic term").

The Court finds that a reasonable jury could conclude that the record supports that Fairfield had OUD and that this made him a qualifying individual with a disability for purposes of the ADA.

There is no dispute that Fairfield abused opiates for years and that he attempted several times to obtain treatment to stop that uncontrollable use. Drug addiction can be considered a disability under the ADA, and here, the record could support that it impaired Fairfield's life enough to be a qualifying disability. 28 C.F.R. § 35.108(b)(2) ("Physical or mental

[11]County Defendants' focus most of their briefing regarding this element of an ADA claim on Fairfield's alleged insomnia, *see* ECF No. 84 at 5–8, but because Fairfield does not bring an ADA claim against County Defendant, ECF No. 95 at 3, the Court disregards this argument.

impairment includes . . . drug addiction."); *see Moore*, 221 F.3d at 950–51. While an individual who is currently "engaging in the illegal use of drugs" cannot claim a qualifying disability, someone who "has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs" or who "is participating in a supervised rehabilitation program and is no longer engaging in such use" may be considered disabled by reason of his drug addiction. 42 U.S.C. § 12210(a) and (b)(1)–(2).

The record also supports a reasonable inference that Fairfield's OUD affected his ability to "think[] rationally and car[e] for himself," which are major life activities under the ADA. ECF No. 95 at 8; 42 U.S.C. § 12102(2)(A) (listing "thinking" and "caring for oneself" as major life activities under the ADA); *see Moore*, 221 F.3d at 951 (citation omitted). The parties agreed to Fairfield's description of the symptoms he experienced while in withdrawal at WCJ: "stomach pain, bone/joint pain, muscle pain, headaches, nausea, and vomiting three to four times, loss of appetite, confusion, hot and cold flashes, sweating, dehydration, weight loss and a craving for opiates." ECF No. 85 at 25. This alone could support an inference that Fairfield's OUD interfered with his ability to care for himself and to think, and while it is unclear what portion of these symptoms were a direct result of withdrawal from opiates versus Fairfield's lack of sleep medication, this is a question best resolved by the trier of fact.[12]

[12]The parties argue at length about whether Fairfield's additional declaration about the impacts of his OUD on his life should be admissible at summary judgment in support of his opposition, ECF No. 98 at 2–3 and ECF No. 100-1, but because the Court does not rely on these facts in its findings in this Order, it declines to discuss the issue further.

Finally, for the same reasons just discussed, a reasonable jury could conclude that Fairfield's OUD substantially limited his major life activities of thinking clearly and caring for himself. *See Moore*, 221 F.3d at 951 (citation omitted). The Court accordingly finds that County Defendants have failed to show that there is no genuine issue of material fact as to whether Fairfield was disabled under the ADA and was therefore entitled to its protections.

**4.3.1.2 Denied Benefits of a Public Entity**

Medical services are among the "services, programs, or activities" that are covered by the ADA. *United States v. Georgia*, 546 U.S. 151, 157 (2006) ("[T]he phrase 'services, programs, or activities' in § 12132 includes . . . medical . . . programs." (citing *Yeskey*, 524 U.S. at 210)).

County Defendants argue that Fairfield does not show that he was denied any benefits from WCJ, but rather he is merely unhappy with the medical treatment that he received, which is not a proper claim under the ADA. ECF No. 84 at 9–10. Fairfield responds that he was "deprived of any access to [his prescribed] methadone . . . for his opioid disorder" due to the "directives contained in the policy of Waukesha County." ECF No. 95 at 11.

The Court finds that a reasonable jury could determine that Fairfield was denied continued methadone—a prescription medication—due to Waukesha County policy. The policies, as described *supra* Section 2.3, provided that pregnant and employed inmates at Waukesha County facilities (WCJ and Huber) could continue prescribed MAT programs, including methadone, but unemployed, non-pregnant inmates would receive only treatment for withdrawal. And a former deputy jail administrator for Waukesha County testified that "as a matter of scripted policy" unemployed, non-pregnant inmates had their "methadone maintenance programs terminated" when they were "checked into" WCJ, but

that there is "nothing scripted in policy stating" that any other medication regime for another illness would be terminated in that way as a matter of course. ECF No. 85 at 40. County Defendants completely ignore these policies in their briefs, perhaps because they support a reasonable finding that Waukesha County policy, rather than medical judgment, resulted in a categorical denial of continued MAT for unemployed, non-pregnant inmates.

#### 4.3.1.3 Denial of Benefits Was Based on Disability

County Defendants contend that "the facts of this case establish that Fairfield was not excluded from any program or activity as a result of his alleged . . . OUD," because "Brown was never provided with any information that Fairfield was prescribed methadone or was suffering from any withdrawal symptoms . . . ." ECF No. 84 at 10. "How could Fairfield possibly establish intentional discrimination 'by reason of' disability," they argue, "when the sole medical decisionmaker—Dr. Brown—had no knowledge of any disability and no awareness that any decision regarding methadone was required?" ECF No. 98 at 6. But County Defendants incorrectly silo Brown as the "solo" decisionmaker, but that is not borne out by the record. Rather, the nurses filling out his paperwork and verifying Fairfield's medications, deciding whether or not (and when) to seek clarification as to certain prescription medications, as well as responding to Fairfield's requests for treatment, can be considered relevant actors that played a part in Fairfield being denied methadone treatment. And at least the initial nurse who filled out his Medical Screening Form was aware that Fairfield had been prescribed methadone but chose not to inquire of Fairfield any further details (such as the prescribing physician for that) or to otherwise attempt to verify that medication while he was at WCJ. And there is some evidence to suggest that Fairfield repeatedly asked nurses

tending to him for his methadone as well, *see* ECF No. 88 ¶ 4; this prompted no efforts to verify his prescription or to follow-up with the on-call physician either. The reason for those decisions is one for the jury, who could reasonably determine that it was because of Waukesha County's policies on MAT for inmates with OUD.

County Defendants completely ignore Waukesha County's policies, and related testimony, which establish that continued MAT treatment—and *only* MAT treatment—was declined as a matter of policy for unemployed, non-pregnant inmates at WCJ. It is possible that Waukesha County has non-discriminatory reasons for its policy of denying continuation of MAT to unemployed, non-pregnant inmates with OUD, County Defendants fail to provide or point to any evidence that supports a single, non-discriminatory, justification for this policy. *See Est. of Crandall*, 2015 WL 1539017, at *6 ("[P]risons may violate the ADA when they fail to provide inmates with access to medications prescribed by physicians on the basis of inmates' disability." (citing *Kiman v. N.H. Dep't of Corrs.*, 451 F.3d 274, 285–87 (1st Cir. 2006) and *McNally*, 46 F. Supp. 2d at 58–59)); ECF No. 95 at 14 ("Discrimination can be proven by comparison." (citing *Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013)).[13]

And while there is certainly evidence to support that there were other reasons that Fairfield's methadone was discontinued—such as his failure to write his prescribing physician for his methadone unlike his other

[13]It is true that Waukesha County's policies expressly provide for continued MAT to other inmates with OUD—pregnant and/or employed inmates—but the Supreme Court has "allowed intra-class claims of discrimination," and County Defendants have not provided any argument about how the policies should be interpreted in this case. *Amundson*, 721 F.3d at 874; *see also Olmstead v. L.C. ex. Rel. Zimring*, 527 U.S. 581, 587 n.10 (1999).

prescription medications—a reasonable jury could instead find that it was Waukesha County policy that drove the denial. These are facts that must be weighed by the trier of fact to determine whether Waukesha County policy resulted in discrimination against Fairfield due to his OUD.

#### 4.3.1.4 ADA Conclusion

The Court will deny County Defendants' motion for summary judgment as to Fairfield's ADA claim because there exist genuine disputes of material fact as to whether Fairfield's disability was the reason he did not receive his methadone treatment during his time at WCJ. The record before the Court on summary judgment could allow a reasonable jury to infer discriminatory intent from Waukesha County policies that treated prescriptions for inmates with OUD differently than prescriptions for inmates with other ailments.

### 4.3.2 Section 1983 *Monell* Claim

Fairfield alleges that Waukesha County violated his Eight Amendment right to be free from cruel and unusual punishment "when [it] established policies and permitted widespread practices that were deliberately indifferent to his serious medical needs." ECF No. 1 at 18. A government entity may be liable for monetary damages for constitutional violations pursuant to 28 U.S.C. § 1983 and *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690 (1978). A *Monell* claim requires that a plaintiff show that (1) he was deprived of a federal right, (2) the deprivation is attributable to the municipality itself through a policy or custom, and (3) the policy shows municipal fault, i.e., deliberate indifference. *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021);

*Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). The Court takes each element in turn.

**4.3.2.1 Constitutional Deprivation**

It is "settled and familiar" that a plaintiff "must initially prove that he was deprived of a federal right . . . *before* municipal fault, deliberate indifference, and causation come into play." *LaPorta*, 988 F.3d at 987.

Waukesha County argues that Fairfield cannot show any constitutional deprivation because Brown was not deliberately indifferent to any of Fairfield's serious medical needs. ECF No. 84 at 12–16. Because it is undisputed that Brown was not aware of Fairfield's prescription for methadone or that he was experiencing any withdrawal symptoms, it argues that "no reasonable trier of fact could conclude that . . . Brown acted with deliberate indifference toward Fairfield." *Id.* at 14–15. The Court agrees with this conclusion, *see supra* Section 4.2, but does not agree that it follows that Fairfield cannot show a constitutional deprivation.

Nor is it fatal to Fairfield's claim that he does not allege that any correctional officers were deliberately indifferent to his serious medical needs. ECF No. 84 at 15–16. This is because, as Fairfield points out, "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." ECF No. 95 at 18 (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (further citations omitted)). "[T]o determine whether [a] [c]ounty's liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.* (citing *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002)). Fairfield has alleged that Waukesha County's policy of discontinuing

methadone (and similar medications) for non-pregnant prisoners at WCJ resulted in a violation of his right to be free from cruel and unusual punishment due to his forced withdrawal. It is entirely possible, then, that while the individual medical providers and correctional officers may not have been deliberately indifferent to Fairfield's withdrawal but were nevertheless forced to abide by Waukesha County's policy. Accordingly, Fairfield's *Monell* claim does not rest on individual deliberate indifference, as Waukesha County argues.

As to the merits of Fairfield's Eighth Amendment claim, the Court is not prepared to say that no reasonable jury could find that Fairfield's forced withdrawal violated Fairfield's constitutional right to be free from cruel and unusual punishment. *See Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (reversing summary judgement because of a genuine dispute of material fact over whether prison conditions constituted cruel and unusual punishment). Fairfield disclosed that he was prescribed methadone for opioid addiction during his intake to WCJ (though he omitted the prescribing physician); he was discontinued from his methadone and reports having experienced the following symptoms due to his forced withdrawal: "stomach pain, bone/joint pain, muscle pain, headaches, nausea, and vomiting three to four times, loss of appetite, confusion, hot and cold flashes, sweating, dehydration, and weight loss and a craving for opiates." ECF No. 85 at 25. The trier of fact must weigh all the underlying facts to determine whether Fairfield's experience qualifies as cruel and unusual punishment in violation of the Eighth Amendment.

#### 4.3.2.2 Attribution to the Municipality

"A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citations omitted). Specifically, the constitutional violation must have been caused by "(1) an express policy of the municipality; (2) a widespread practice constituting custom or usage; or (3) an act by a person with final policymaking authority." *Betts v. Boone County*, 178 F.4th 1051, 1056 (7th Cir. 2026) (citing *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 747 (7th Cir. 1999) and *Dean*, 18 F.4th at 235). Municipalities do not enjoy absolute or qualified immunity from § 1983 suits. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993).

The Court described above its finding that Waukesha County had an official policy prohibiting continued methadone for non-pregnant prisoners at WCJ. *See supra* Sections 4.3.1.2 and 4.3.1.3; *see also supra* Section 2.3. Accordingly, any constitutional deprivations that occurred *because of* this policy (*see infra* Section 4.3.2.4) would subject Waukesha County to liability under *Monell*.

#### 4.3.2.3 Municipal Fault

To show municipal fault—i.e., that the municipality was deliberately indifferent—is a "high bar." *LaPorta*, 988 F.3d at 987. A plaintiff must show either that a policy is facially unconstitutional or "that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* (citation omitted); *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) (The fault standard, along with the causation showing "amount

to a requirement that liability be based on a finding that the policymakers have actual or constructive notice that a particular [action, policy, or] omission is likely to result in constitutional violations").

Fairfield argues in passing—and without any authority or argument in support—that Waukesha County's policy of discontinuing methadone for non-pregnant prisoners at WCJ is facially unconstitutional as violating equal protection. ECF No. 95 at 23. Fairfield forfeits the point by mentioning it only in passing. *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point."). Accordingly, the relevant question is whether it was "obvious" to Waukesha County that it's methadone policy would lead to constitutional violations. *LaPorta*, 988 F.3d at 987.

"The [Supreme] Court has held that where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the policy and the constitutional deprivation." *Calhoun v. Ramsey*, 408 F.3d 375, 380–81 (7th Cir. 2005) (internal quotes and citation omitted).

Both Fairfield, and Waukesha County at times, meld their discussion of the notice requirement with the widespread custom or practice argument, but they are distinct (indeed, here no widespread custom or practice requirement exists because the Court has found that there is an official policy at issue). *See* ECF No. 95 at 22–25. Fairfield's argument as to fault is difficult to discern, but the Court interprets him as contending that the fact that WCJ housed eighteen other prisoners who were taking

methadone and were not pregnant, and four prisoners who were taking methadone and were pregnant, that "the policy that deprived inmates of continuation of their methadone treatment had widespread ramifications." *Id.* at 24. But the presence of other prisoners who took methadone does not meet the "high bar" of showing that that a constitutional violation from discontinuing methadone for non-pregnant WCJ prisoners was "obvious." *LaPorta*, 988 F.3d at 987. Fairfield has provided no evidence that any other prisoner experienced what could be considered cruel and unusual punishment as a result of forced withdrawal, nor has he shown or even suggested that Waukesha County was aware of repeated occurrences such as these.

Fairfield points to a 2006 Seventh Circuit case that reversed a summary judgment ruling in favor of Cook County due to genuine issues of material fact regarding whether Cook County had a widespread custom or practice of delaying prisoners' methadone. *See Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006). This is a far cry from a ruling that delay in providing (or refusal to provide) methadone treatment to prisoners with OUD is an Eighth Amendment violation. Indeed, the Seventh Circuit in *Davis* recognized that Cook County's arguments might ultimately be persuasive to the factfinder, but merely that the existence of genuine issues of material fact precluded summary judgment for Cook County. *Id.* at 695. This is too uncertain to provide constructive notice of constitutional violations stemming from denying continued methadone to prisoners.

Fairfield has provided some relevant evidence, however, from which a reasonable factfinder could find that Waukesha County had notice of potential constitutional violations. Namely, (1), in the statement of disputed facts, the parties dispute whether it was obvious when Fairfield was

incarcerated that withholding methadone from someone taking it for opioid addiction causes withdrawal, ECF No. 88 ¶¶ 6–12, and (2) the agreed statement of facts that refers to a Wisconsin Study which reveals that the Wisconsin Department of Corrections was actively expanding methadone-related pilot programs in Waukesha County as of 2020 (prior to Fairfield's time at WCJ in 2021). Whether the issue of discontinuing methadone was one that would have been "obvious" to Waukesha County in 2021 as leading to constitutional violations is ultimately a question for the factfinder.

#### 4.3.2.4 The Policy was the Moving Force Behind the Deprivation

Finally, a plaintiff must establish that "the municipal action was 'the moving force behind the federal-rights violation.'" *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 987). This is a "rigorous" causation standard that requires a "direct causal link" between the challenged municipal action and the violation of the plaintiff's rights. *Id.* (quoting *LaPorta*, 988 F.3d at 987).

Waukesha County argues that Fairfield fails at the causation element because his own actions were the real cause of his withdrawal: (1) his rule violation that resulted in his return to WCJ from Huber, and (2) his failure to provide the prescribing physician for his methadone. ECF No. 84 at 4, 27; ECF No. 98 at 9. Fairfield responds that his withdrawal symptoms are "certainly causally related to [Waukesha] County's policy" to discontinue methadone. ECF No. 95 at 26. Here, the Court finds there is a genuine issue of material fact as to whether Waukesha County's policies related to methadone caused Fairfield's withdrawal symptoms. Because a reasonable jury could look at the evidence about the policies themselves and Fairfield's

testimony about his repeated requests for his methadone, as well as his submitted requests for his methadone, and find a sufficient causal link, summary judgment for Waukesha County is inappropriate.

## 5. SUR-REPLY

After the County Defendants filed their reply in support of their motion for summary judgment, ECF No. 98, Fairfield moved for leave to file a sur-reply to address an argument made for the first time in County Defendants' reply. ECF No. 100. County Defendants did not oppose the motion. Accordingly, the Court will grant the motion. The Court considered the arguments made in Fairfield's proffered sur-reply, ECF No. 100-1, but for the reasons explained *supra* note 12, does not discuss those arguments herein.

## 6. CONCLUSION

For the reasons stated herein, the County Defendants' motion for summary judgment will be denied, and Brown's motion for summary judgment will be granted. Further, Fairfield's motion to permit the expert testimony of MacDonald will be denied without prejudice, and his motion to permit the testimony of Ward will be denied without prejudice Lastly, Fairfield's motion for leave to file a sur-reply will be granted.

The Court is issuing a trial scheduling order contemporaneously with this Order.

Accordingly,

**IT IS ORDERED** that Defendant Waukesha County and Eric Severson's motion for summary judgment, ECF No. 83, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Temu Brown's motion for summary judgment, ECF No. 86, be and the same is hereby **GRANTED**;

Defendant Temu Brown be and the same is hereby **DISMISSED with prejudice** from this action;

**IT IS FURTHER ORDERED** that Plaintiff Cory Fairfield's motion to permit the expert testimony of Dr. Ross MacDonald, ECF No. 76, be and the same is hereby **DENIED without prejudice;**

**IT IS FURTHER ORDERED** that Plaintiff Cory Fairfield's motion to permit the expert testimony of R.N. Suzanne Ward, ECF No. 80, be and the same is hereby **DENIED without prejudice;** and

**IT IS FURTHER ORDERED** that Plaintiff Cory Fairfield's motion for leave to file a sur-reply, ECF No. 100, be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 22nd day of September, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge